HOLMBERG et al. v. SOUTHERN MINNE-
SOTA JOINT STOCK LAND BANK OF
MINNEAPOLIS et al.

No. 2420.

District Court, D. Minnesota, Fourth Division.
April 3, 1935.

John C. Benson and Loring M. Staples, both of Minneapolis, Minn., for complainants.

L. R. Barker, of Minneapolis, Minn., for defendants Southern Minnesota Joint Stock Land Bank of Minneapolis, Roy A. Nelson, and Ervin J. Friede.

Allen & Whitfield, of Des Moines, Iowa, and Prendergast, Flannery & Young, of Minneapolis, Minn., for defendants Fred W. Orth, A. L. Olson, Harry J. Heider, and the First State Bank of Gary, Minn.

Jesse Van Valkenburg, of Minneapolis, Minn., for defendant Dr. E. L. Baker.

NORDBYE, District Judge.

This is a creditors' bill brought on behalf of the plaintiffs and all other creditors who may intervene herein. This form of action to enforce stockholders' liability of a joint stock land bank is suggested and approved by the Supreme Court in Wheeler v. Greene, 280 U. S. 49, 50 S. Ct. 21, 74 L. Ed. 160. On May 2, 1932, the Federal Farm Loan Board, acting under and pursuant to the authority contained in the Federal Farm Loan Act, declared the Southern Minnesota Joint Stock Land Bank of Minneapolis to be in default and to be insolvent, and appointed a receiver. Immediately thereafter the receiver commenced to liquidate the estate and has been liquidating the assets since that time as rapidly as possible. The par value of the outstanding stock is $3,000,000, and according to the statement of condition of the bank as of January 31, 1935, it would appear that there is an anticipated deficiency of nearly $4,000,000. This statement reflects assets of $20,298,239.59, and liabilities in the sum of $24,562,927.18. The deficiency reflects the book value of the real estate owned outright by the receiver, aggregating some $11,000,000 in value, and the deficiency will be further increased if one accepts the appraisers' valuation of this real estate, which, according to the testimony, does not exceed $8,000,000 in value.

The gross mortgage loans total $3,346,750, with accrued interest of some $370,000, the collectability of which is extremely doubtful. Out of 664 loans, only 160 are not in default. It further appears that some 477 loans amounting to approximately $2,808,205.23 are in default three months or over. The operating statement of the receivership indicates that the mortgage loans liquidated to October 31, 1934, were liquidated at a loss of about 16.1 per cent. of the receiver's carrying value. As a further indication of the loss that is being sustained in liquidation, the receiver estimates that some 179 additional loans, which will be liquidated through the Federal Land Bank, will net the estate approximately $889,000, but the carrying value of these loans on the receiver's books approximate $1,111,000. The total expense of the receivership from May 1, 1932, to October 1, 1934, was $1,553,110.56. It must be evident, therefore, that the losses sustained in liquidation and the expenses to which the estate is now subject, will increasingly deplete the receiver's book values and greatly enhance the deficiency that already appears on the receiver's books.

Defendants earnestly urge that the appraisers' valuation of the real estate holdings is based on a market value, and that, in view of the scarcity of sales at this time, it is impossible to determine the true market value, and it is urged that, in determining the value of the real estate, the court should consider the normal value, which is the capitalization of the average income of the property over a designated number of so-called normal years, plus the value of the buildings. Defendants contend that the appraisers' valuation reflects depressed values, and the price the property would bring on a forced sale, and it is contended by the defendants that if the normal value standard is applied to the real estate holdings, there will be an increase in the book value of some $11,000,000 to approximately $14,000,000; consequently, it is urged that the normal valuation of the real estate will largely absorb the apparent deficiency that is reflected by the receiver's book values.

It would seem that we are confronted with an eminently practical problem. Of the 1,475 farms owned outright by the receiver, some 714 are located in the state of South Dakota, where drought conditions have been for several years uniformly bad and where depressed values still continue. Of the 752 Minnesota farms, a majority are situated in Western Minnesota, where agricultural conditions during the past several years have been relatively poor. The appraisers who testified as to the values of these farms are experienced, capable men, and clearly competent to testify as to market values. While it is true that the number of sales are few, nevertheless, the long contact that these men have had with these

particular farms and their acquaintance with the values in the respective communities clearly qualify them to express opinions as to market values. It is highly significant that the receiver is not abiding his time for the return of the so-called normal values, but is engaged in the liquidation of all his holdings under the present so-called depressed conditions. At the present time, a large number of farmers are able to obtain federal loans, and the receiver is taking advantage of this opportunity to dispose of his lands to purchasers who are able to obtain such loans. While the so-called normal values may again return and land values may be considerably enhanced during the next few years, it is quite apparent that the receiver does not intend to speculate as to the return of such values, and is expeditiously engaged in liquidation. In support of the values offered by the appraisers produced by the plaintiffs, it might be observed that the sums realized by the receiver during the past few months for farms that have been sold outright represent approximately the appraisal figures or less. The court was impressed with the apparent fairness and general qualifications of these real estate appraisers, who are still in the employ of the government, and their disinterestedness must be conceded.

It must be remembered that these creditors have no authority over the receiver, nor can they dictate to him as to his policies in liquidating this estate. It is highly probable that before the return of any so-called normal values, the greater part of the estate will have been liquidated and reduced to cash. Of course, as far as values are concerned, no one can at this time determine whether farm values will be lower or higher during the next few years. The right to enforce stockholders' liability, as provided by the statute, should not be jeopardized by requiring the creditors to speculate as to the future. In considering the entire testimony, the court is convinced that the fair market value is the standard that should be applied in the determination of the value of the receiver's assets, and that the reasonable and fair market value of the real estate holdings of the receiver is appreciably less than the book values as reflected in the statement of January 31, 1935.

The defendants further contend that this action is premature, and that the assets should first be exhausted and the cash position of the receiver definitely determined before the court enters a decree enforcing stockholders' liability. It is pointed out that some of the bonds are not due until 1950, and that there is no acceleration clause in the bonds. It is urged that the "debts, engagements and contracts" of the bank, referred to in 12 USCA § 812, contemplate debts of the bank which are presently due and payable. The bank has entered into voluntary liquidation. It has admitted its inability to pay the interest on these bonds as the interest becomes due, and by the sale of its assets in liquidation and its discontinuance of any business as a land bank, it is apparent that it has divested itself of the means by which it can retire these bonds when they mature. It has renunciated in unmistakable terms the contract which it made with the bondholders. The whole scheme of joint stock land banks was to correlate and interweave, so to speak, in time and effect, the mortgages pledged to secure the bonds and the maturity of the bonds. However, the plan has been destroyed upon the voluntary liquidation of the bank and its cessation of business. To contend that the bondholders, under such circumstances, must notwithstanding wait until the bonds become due before they can be heard in an action to enforce stockholders' liability, is to deny to the bondholders the very protection and security afforded by the statute. Where the bank has divested itself of any and all power to carry out its contract with the bondholders, and has by its voluntary liquidation and cessation of business renunciated its obligation to its bondholders, an anticipatory breach has occurred which matures these bonds, and the holders thereof are the owners of debts, contracts, and engagements within the meaning of the statute in question. In fact, it is not necessary to indulge in theory or academic reasoning in order to sustain this action, because the bank itself has definitely recognized the holders of these bonds as creditors whose debts are now due. It has declared a 20 per cent. dividend on all bonds regardless of their due date, and the dividend is computed upon the face value of all bonds and accrued interest up to May 1, 1932.

The burden of proof which rests upon the complainants has been amply sustained. The indisputable weight of the testimony necessitates a finding that the deficiency in the assets will be appreciably in excess of the outstanding stock. It might be noted that the interest on the bonds alone, which has accrued since the date of the re-

ceivership, and which is now due, aggregates nearly $3,000,000. This item alone is impelling in sustaining the views of the complainants as to the unquestioned necessity of the assessment. Furthermore, the court takes judicial notice of the experience commonly encountered in similar suits as to the ability of the stockholders to respond. Unquestionably, a sum far below the face value of the stock will be realized in these times when a depression is still prevalent. If the exceedingly remote contingency should arise that the 100 per cent. assessment is excessive, then the funds will be subject to an order of refundment, and substantial justice can be done. On the other hand, if the order of assessment should be deferred, and the court should require the bondholders and other creditors to speculate as to the future, an irreparable loss may result to the creditors. But even assuming that the stockholders respond in the total amount of their assessment, a large deficiency is inescapable. Where it appears that the receiver of a joint stock land bank is liquidating the assets as rapidly as possible, has ceased doing any business except to liquidate and the fair market value of the assets to be liquidated will in all probability result in a deficiency far in excess of the amount to be realized from the stockholders, then clearly there is no necessity to exhaust the assets before proceeding with the enforcement of the statutory liability.

At the time of the trial, the court took under advisement the offer of certain exhibits designated as supplemental exhibits to Plaintiffs' Exhibits Nos. 31 to 42, which are the appraisal schedules. These exhibits were offered as supplemental by the defendants and purported to list the book values of the lands under foreclosure and sheriff's certificates; it being defendants' contention that the stipulation covering the reception of the appraisal reports merely covered real estate and did not intend to cover lands under foreclosure or sheriff's certificates, and for that reason the book value should control. Clearly, however, it was the intention of the parties when the stipulation was entered into to permit the appraisers' figures to be received, not only as to the lands held outright, but as to the lands held by way of sheriff's certificates and those under foreclosure. Defendants' construction of the stipulation is not justified by all the facts and circumstances of this case, and would place a technical interpretation upon the stipulation, one not contemplated by the parties when the stipulation was entered into. The whole purpose of the stipulation was to expedite the trial. If the appraisers' testimony as reflected in these schedules is competent as to the value of the lands owned outright, it is just as competent to express values of the lands under foreclosure and those held by sheriff's certificates. The defendants' offer of the supplemental exhibits was not timely, and the objection to the offer of such supplemental exhibits, the ruling on which has been deferred, will therefore be sustained.

Let this memorandum be made a part of the foregoing findings of fact and conclusions of law.